**UNIVERSITY GRAPHICS, INC., Plaintiff,**

v.

**PRO–IMAGE CORPORATION, MDC Corporation, Defendants.**

**Civil Action No. 1:CV–94–2012.**

United States District Court, M.D. Pennsylvania.

Jan. 30, 1996.

340

Eric S. Scher, Harrisburg, PA, David F. Tamanini, Harrisburg, PA, for University Graphics, Inc.

Kristen L. Darke, Buchanan Ingersoll Professional Corporation, Harrisburg, PA, Jack M. Stover, Buchanan Ingersoll, P.C., Harrisburg, PA, for Pro–Image Corp., MDC Corp.

Lillian M. Morgan, Countess, Gilbert, Andrews, York, PA, for Owen, Inc.

Clyde W. Vedder, York, PA, for H.G. Rotz Associates, Inc.

## MEMORANDUM

CALDWELL, District Judge.

This action arises from a lease of property owned by Owen, Inc. ("Owen") in York, Pennsylvania. The Plaintiff, University Graphics, Inc. ("University") maintains that the Defendants, Pro–Image Corporation ("Pro–Image") and MDC Corporation ("MDC") [1], interfered with its contractual, or prospective, relationship with Owen by inducing Owen not to lease the property to Uni-

---

1. Pro–Image is a wholly owned subsidiary of MDC.

versity. We are considering the Defendants' motion for summary judgment.

## I. BACKGROUND

Pro–Image and University are each engaged in the pre-press services business. During 1994, both were seeking to lease commercial space in the York area, and were shown potential locations by H.G. Rotz Associates, Inc. ("Rotz"). One of those locations was owned by Owen ("the property").[2] David Keech, a Rotz agent, showed the property to Pro–Image, while W. George Bliss, also a Rotz agent, showed the property to University.

Pro–Image signed a written Offer to Lease the property on August 9, 1994. Thereafter, renovations began and Pro–Image was to occupy the building on September 1, 1994. A final lease agreement was signed on or about August 26, 1994.

During the same period, Bliss was negotiating a lease with Jeffrey Barrie and Jay Lininger, who were acting on behalf of University. Discussions were held concerning terms of a lease and, at some point in August, 1994, a written agreement was drafted. However, the document was never signed.

In late August, Pro–Image became aware that Owen was considering leasing space or had leased space in the same building to University. Joseph Bugelli, the president of Pro–Image, contacted Owen and Rotz about this possibility. Bugelli felt that this presented a serious problem and informed Owen and Rotz of his displeasure. He stated that University was a "fierce" competitor of Pro–Image and had threatened to take Pro–Image's employees. He also related that University had recently been bested by Pro–Image in bidding for the assets of another company, and, he believed, harbored ill-will toward Pro–Image.

On August 26, 1994, Owen informed University that it would not lease space to University in order to avoid "a conflict between tenants." University instituted this action on December 14, 1994. It advances a claim against Pro–Image and MDC for intentional interference with University's contractual relations with Owen (Count II). It also contends that, in the event no contract with Owen existed, Pro–Image and MDC intentionally interfered with its prospective contractual relations (Count III).[3]

On November 17, 1995, Defendants filed the instant motion for summary judgment. The parties have briefed the issues and the matter is ripe for resolution.[4]

## II. LAW AND DISCUSSION

### A. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party...." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356, 89 L.Ed.2d at 552 (citations omitted).

When a moving party has carried his or her burden under Rule 56, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Id.* (citations

---

**2.** At that time, and at all times relevant to this action, Rotz was acting as Owen's agent for the purpose of leasing the property.

**3.** University also set forth a claim for breach of contract against Owen and Rotz (Count I). However, in November, 1995, University voluntarily dismissed all claims against Owen and Rotz. Additionally, all cross-claims between Owen and Rotz were dismissed. Because Pro–

Image and MDC are the only remaining Defendants we will at times refer to them jointly as "Defendants".

**4.** Defendants also filed a motion to compel and for leave to take a deposition pursuant to Fed. R.Civ.P. 30(b)(6). That motion is also ripe for decision.

omitted). The nonmoving party "must present *affirmative evidence* in order to defeat a properly supported motion for summary judgment," and cannot "simply reassert factually unsupported allegations contained in [the] pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989) (emphasis in original) (citation omitted). However, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986) (internal citations omitted).

### B. *Interference with Contractual Relations*

University alleges that the Defendants intentionally interfered with its contractual relations by inducing Owen to breach an oral agreement with University.

■■■ In Pennsylvania, a claim for intentional interference with business or contractual relations is governed by section 766 of the Restatement (Second) of Torts. *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 431, 393 A.2d 1175, 1183 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979). That section provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766. In order to establish a violation under this section, a plaintiff must prove the following: (1) the existence of a contract between the plaintiff and a third person; (2) the purpose or intent to harm plaintiff by preventing the completion of the contractual relations; (3) conduct by the defendant that is not proper as a matter of law and which a factfinder could reasonably find improper[5]; and (4) actual harm resulting from the defendant's conduct. *Adler, Barish*, 482 Pa. at 431, 393 A.2d at 1183; *Silver v. Mendel*, 894 F.2d 598, 604–05 (3d Cir.), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

■■■ Although it is undisputed that there was no written agreement between University and Owen, University maintains that an oral lease was negotiated and agreed to in early August, 1994, and that a written lease was merely a formality. For a contract to be formed there must be a manifestation of an intent by each party to be bound. *Philmar Mid–Atlantic v. York St. Assoc. II*, 389 Pa.Super. 297, 301, 566 A.2d 1253, 1255 (1989) (citations omitted). Admittedly, "where the parties have settled on the terms of the agreement, the intent to later formalize that agreement in writing does not prevent the formation of a contract." *Id.* However, "[a]bsent a manifestation of an intent to be bound, . . . negotiations concerning the terms of a possible future contract do not result in an enforceable agreement." *Id.*

---

5. Recently, numerous courts have applied a different third element, requiring that the defendant's conduct be "without justification or privilege." *See Schulman v. J.P. Morgan Inv. Management, Inc.*, 35 F.3d 799, 807 n. 14 (3d Cir.1994); *Al Hamilton Contracting Co. v. Cowder*, 434 Pa.Super. 491, 497, 644 A.2d 188, 191 (1994); *Triffin v. Janssen*, 426 Pa.Super. 57, 63, 626 A.2d 571, 574 (1993), *appeal denied*, 536 Pa. 646, 639 A.2d 32 (1994); *Neish v. Beaver Newspapers, Inc.*, 398 Pa.Super. 588, 599, 581 A.2d 619, 625 (1990), *allocatur denied*, 527 Pa. 648, 593 A.2d 421 (1991); *but see Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1388 (3d Cir.1991) (listing third element as improper conduct). This change is traceable to the decision in *R.P. Russo Contractors & Engineers, Inc. v. C.J. Pettinato Realty & Development, Inc.*, 334 Pa.Super. 72, 80, 482 A.2d 1086, 1090 (1984). There, citing the Supreme Court's decision in *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971), the court listed "without justification or privilege" in place of "improper" as an element of interference with contractual relationships. However, the citation to *Glenn* in *R.P. Russo* was not appropriate since *Glenn* involved interference with prospective contractual relations rather than interference with contractual relations, and because *Glenn* was decided prior to the Pennsylvania Supreme Court's decision in *Adler, Barish*, which adopted § 766 of the Restatement (Second) of Torts for interference with existing contracts. We need not dwell on this distinction because Defendants' conduct was neither improper nor without justification.

Upon review of the record, we find that no reasonable jury could conclude that an oral agreement was ever made.

The individuals responsible for negotiating the lease were Bliss, on behalf of Owen, and Barrie and Lininger, on behalf of University. Bliss testified as follows:

A: There were discussions about whether or not there would be a written lease required, yes.

Q: And what were the nature of those discussions?

A: I told Jay Lininger that a lease had to be executed by both parties before there could be commitment and that had to be done before buildout could start.

. . . . .

Q: Did you explain to [Lininger] why [Owen] wouldn't commit before a lease was signed?

A: Yes, I did.

Q: What explanation did you give him?

A: I told him that until a lease is signed either party can back out of it. . . .

[G. Bliss Dep. at 49, 51]. Lininger, University's representative, also testified that he was aware that Owen would not be bound by an oral agreement:

Q: And is it also true that George Bliss clearly explained to you that ... Owen would not be bound by any lease agreement until both parties had duly executed a written lease.

A: Yes, he did convey that.

. . . . .

Q: But is it fair to state that you did understand during these negotiations that until the document was fully executed, Owen was not committed to leasing the space to University Graphics?

A: I'll answer that the way I just did. We knew that we could not have occupancy without a signed lease.

Q: Didn't you also understand that the buildouts would not commence until there was an executed lease?

A: That's right.

. . . . .

Q: Did Mr. Bliss ever represent to you or to Mr. Barrie in front of you that he had authority to agree to an oral lease on behalf of Owen?

A: No, I don't recall that.

Q: In fact, you were aware throughout the negotiations that Owen was not committed until there was a written lease agreement signed by both parties?

. A: I think I had that understanding, yes.

[J. Lininger Dep. at 33, 43, 65]. Further, it is undisputed that Bliss did not have the authority to bind Owen to an oral agreement. [G. Bliss Dep. at 46].[6]

■ University contends that there is a genuine issue as to the existence of an oral agreement. Jeffrey Barrie, president of University, was asked about the alleged oral agreement:

Q: Did Mr. Bliss explain to you that Owen would not be bound until the written lease agreement was executed by both parties?

A: I don't recall that being said. Mr. Bliss gave me positive indications to points discussed which led me to believe that writing or incorporating the points that we discussed into a written document was merely a formality, because we weren't at odds with any of the items we discussed.

. . . . .

Q: Would you tell me more specifically, please, what George Bliss said that you took as a positive indication about the lease terms you were talking about?

A: That the build outs could be accomplished, if we so desired, that we could be in within a very quick time frame, and that after his checking, that no one else had requested to be considered for the property, so that there wasn't anyone else in front of us.

[J. Barrie Dep. at 17, 45]. However, this testimony does not cast doubt on the evidence submitted by Defendants that Owen, through its agent Bliss, expressly informed

---

**6.** In addition, A. Thomas Owen, owner of Owen, Inc., plainly indicated that the terms of the lease had not been agreed to as of August 29, 1994. [T. Owen Dep. at 32].

University, through its agent Lininger, that it would agree to be bound only by a written agreement. *See Philmar Mid–Atlantic,* 389 Pa.Super. at 302, 566 A.2d at 1255 ("There is no cause of action to enforce a contract absent a mutual manifestation of assent to be bound"); *see also Schulman,* 35 F.3d at 807–08. Further, neither Barrie nor Lininger assert that anyone from or on behalf of Owen expressly indicated that Owen would enter an oral agreement to lease the property. Barrie's belief that a written agreement was a mere formality is irrelevant in light of the undisputed testimony that University (through Lininger) was aware that no oral lease would be agreed to by Owen.[7] We find, therefore, that no reasonable factfinder could conclude that an oral lease was made.

■ Even assuming an oral agreement did exist, Defendants' conduct was not improper. Section 767 of the Restatement (Second) of Torts sets forth numerous factors that are used to determine whether a defendant's conduct was improper. *Adler, Barish,* 482 Pa. at 433 n. 17, 393 A.2d at 1184 n. 17. That section provides:

> **Factors in Determining Whether Interference is Improper.** In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the

interference and (g) the relations between the parties.

Restatement (Second) of Torts § 767. In addition, the court in *Adler, Barish* found an extract from comment b to section 767 instructive:

> **Privilege to interfere, or interference not improper.** Unlike other intentional torts such as intentional injury to person or property or defamation, this branch of tort law has not developed a crystallized set of definite rules as to the existence or non-existence of a privilege to act in the manner stated in §§ 766, 766A or 766B. Because of this fact, this Section is expressed in terms of whether the interference is improper or not rather than in terms of a specific privilege to act in the manner specified. The issue in each case is whether the interference is improper or not under the circumstances; whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

*Adler, Barish,* 482 Pa. at 433 n. 17, 393 A.2d at 1184 n. 17. In comparing the facts of this case to the factors set forth in section 767, it is apparent that Defendants' conduct was not improper.

The nature of Pro–Image's conduct consisted of[8]: (1) contacting Owen and Rotz to express displeasure at the prospect of being a tenant in the same building with University; (2) informing Owen and Rotz that University was a fierce competitor that had threatened to steal Pro–Image employees; (3) requesting a no-compete clause and an option on the additional space in the property; and (4) Joseph Bugelli indicating that he would have to report the matter to his supervisors.[9] There is nothing in the record to

7. In addition, there were numerous terms that were still unresolved at the time the draft lease was circulated in late August. [E. Scher Dep. at 12]. These included the lease price, who would do the buildouts and the cost, and the interest rate on late payments. The absence of an agreement to these essential terms of a lease necessarily precluded the formation of an oral agreement. *See, e.g., Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 63–64, 563 A.2d 1182, 1185 (1989), *appeal denied,* 524 Pa. 629, 574 A.2d 70 (1990).

8. Although some of this alleged conduct is disputed by Defendants, we will assume, for purposes of this motion, that it occurred.

9. University contends that Pro–Image threatened litigation against Owen and/or a breach of its lease if Owen leased space to University. However, the record is devoid of evidence that such threats were made. To the contrary, both individuals who were contacted by Bugelli testified that no threats were made. [D. Keech Dep. at 20, 28–31]; [T. Owen Dep. at 32, 70–71].

support an inference that these actions were undertaken with an intent to harm University. Rather, the record is replete with evidence that Pro–Image's motive for its actions was to protect its own interests.

Joseph Bugelli, president of Pro–Image, testified in detail about business related concerns he had if University was housed in the same building as Pro–Image. [J. Bugelli Dep. at 36–37, 39]. Further, the testimony of A. Thomas Owen and David Keech, the individuals whom Bugelli contacted after becoming aware of University's interest in the property, supports Bugelli's assertions. Mr. Owen described the concerns that Bugelli expressed to him over competitors sharing the same office building. [T. Owen Dep. at 19, 25–26]. Keech, the Rotz agent who initially showed Defendants the property, testified that Bugelli "had learned that a competitor was looking at the same building and he desired to institute a no-compete clause in the lease document because he thought a competitor in the same building would be detrimental to his business." [D. Keech Dep. at 28].

University has presented no evidence whatsoever to cast doubt upon this testimony. Instead, it argues that the issue is one of credibility, and therefore must be determined by the finder of fact. That argument is incorrect. In *Windsor Securities Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655 (3d Cir.1993), the Third Circuit reversed the district court's grant of summary judgment for the plaintiff, and entered summary judgment in favor of the defendant, on a tortious inter-

ference with contract claim. The court found that nothing in the record indicated that the interests the defendant was attempting to advance were illegitimate. *Id.* at 666.

■ Examining all the allegations set forth in the complaint, and all other admissible evidence, we too are unable to discern an improper interference. *See Green v. Interstate United Management Serv. Corp.*, 748 F.2d 827, 831 (3d Cir.1984). Pro–Image was acting to protect its own business interests. "[W]here an actor is motivated by a genuine desire to protect legitimate business interests, this factor weighs heavily against finding improper interference." *Windsor*, 986 F.2d at 665.

Because it cannot be concluded that an oral agreement existed between University and Owen or, assuming a contract did exist, that Pro–Image improperly interfered with that contract, summary judgment must be entered in favor of the Defendants on Count II.

### C. *Interference with Prospective Contract Relations*

University also contends that, in the event that it did not have a contract with Owen, Defendants interfered with its prospective contract.

■ Intentional interference with a prospective contractual relation is also recognized as a compensable tort in Pennsylvania.[10] *Thompson Coal Co. v. Pike Coal Co.*,

University maintains that George Bliss told Lininger that Bugelli made the threats. First, Bugelli never spoke to Bliss. Rather, he spoke to Keech and Owen. Additionally, when asked whether Bugelli had made threats, Lininger stated only that in his conversation with Bliss "that's where the conversation appeared to be going, but he changed that thought process and said that it was because Owen had made the decision that it was best not to have two competitors in the same building." [J. Lininger Dep. at 69]. Thus, contrary to University's assertions, no one has testified that Bliss ever said that Bugelli threatened Owen with litigation.

10. This cause of action is set forth in section 766B of the Restatement (Second) of Torts, which provides that:

One who intentionally and improperly interferes with another's prospective contractual re-

lation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation. . . .

However, the Pennsylvania Supreme Court has not adopted the view of the Restatement (Second) of Torts with respect to this cause of action *in toto*, opting instead to maintain requirements set forth in the Restatement (First) of Torts. The significant difference between section 766B and Pennsylvania law is that Pennsylvania law examines whether the interference was "privileged" or "justified" while section 766B looks to whether the conduct was "proper". *See Advent Systems, Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir.1991).

488 Pa. 198, 207–08, 412 A.2d 466, 470–71 (1979); *Silver*, 894 F.2d at 601–02. In order to succeed on such a claim, a plaintiff must show: (1) a prospective contractual relation; (2) the purpose or intent to harm plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) actual damage from the defendant's conduct. *Id.*

### 1. Prospective Contractual Relation

■ A. Thomas Owen, owner of Owen, Inc., testified that but for the events that occurred, the lease between Owen and University would likely have been consummated if "everything worked out exactly the way we wanted it...." [T. Owen Dep. at 32]. Accordingly, we conclude that University and Owen had a prospective contractual relationship.[11]

### 2. Purpose or Intent to Harm Plaintiff

■ Defendants maintain that because they sought to advance their own business interests, they did not act with an intent to harm University. In this instance an "intent to harm" requires "only an intention to interfere with the plaintiff's prospective contractual relation, and not malevolent spite by the defendant." *Yaindl v. Ingersoll–Rand Co.*, 281 Pa.Super. 560, 581 n. 11, 422 A.2d 611, 622 n. 11 (1980). Ill will toward the plaintiff and a specific intent to harm the plaintiff are also not required. *Id.; see also Ruffing v. 84 Lumber Co.*, 410 Pa.Super. 459, 469, 600 A.2d 545, 550 (1991), *appeal denied*, 530 Pa. 666, 610 A.2d 46 (1992).

Here, the evidence establishes that Bugelli contacted Owen and Rotz concerning the prospect of University leasing space in the property. In his conversation with Mr. Owen, Bugelli was upset, but did not indicate whether he would take any action. [T. Owen Dep. at 32]. Mr. Keech indicated that Bugelli informed him that he sought a no-compete

clause in Pro–Image's lease and that, in the event of a lease to University, Pro–Image might terminate its lease. [D. Keech Dep. at 19–20, 30–31].

From this testimony, an inference could be drawn that Pro–Image acted with an intent to prevent University from completing a lease with Owen. Accordingly, there remains a genuine issue of fact as to the existence of an intent to harm by Defendants.[12]

### 3. Absence of Justification or Privilege

In *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895 (1971), the court discussed the requirements of a justified or privileged interference:

> The absence of privilege or justification in the tort under discussion is closely related to the element of intent. As stated by Harper & James, The Law of Torts, § 6.11, at 513: "... where, as in most cases, the defendant acts at least in part for the purpose of protecting some legitimate interest which conflicts with that of the plaintiff, a line must be drawn and the interests evaluated. This process results in according or denying a privilege which, in turn, determines liability." What is or is not privileged conduct in a given situation is not susceptible to precise definition. Harper & James refer in general to interferences which "are sanctioned by the 'rules of the game' which society has adopted", and to "the area of socially acceptable conduct which the law regards as privileged"....

*Glenn*, 441 Pa. at 482, 272 A.2d at 899. "[T]he Pennsylvania Supreme Court has determined that the relevant inquiry must focus on the *propriety* of a defendant's conduct considering the factual scenario as a whole." *Ruffing*, 410 Pa.Super. at 468, 600 A.2d at 549 (emphasis in original) (citations omitted).[13]

---

**11.** Defendants do not dispute that there was a prospective contractual relationship between University and Owen.

**12.** Although we need not address this issue in light of our conclusion below, an argument can be made that Bugelli's conduct in notifying Owen and Rotz of his displeasure could not be construed as intending or knowing that interference

with University's potential relations with Owen was likely.

**13.** There is a split in the Pennsylvania Superior Court over the interpretation of this element. In *Yaindl*, the court used the factors set forth in section 767 and stated that " 'the absence of privilege or justification on the part of the defendant,' is merely another way of stating that the

■ As set forth above, Pro–Image contacted Owen and Rotz and expressed its concerns about a competitor being a tenant in the same building. University contends that Pro–Image threatened litigation and/or a breach of its lease with Owen, an assertion not supported by the record. However, even assuming that Pro–Image made such threats, that conduct falls within the "rules of the game" permitted by society. *Glenn,* 441 Pa. at 482, 272 A.2d at 899. Pro–Image was faced with the prospect of sharing a building with a company it termed a fierce competitor, and a company that had threatened to take its employees.[14] It was justified in acting to protect its own interests. *See Cloverleaf Development v. Horizon Financial,* 347 Pa.Super. 75, 83, 500 A.2d 163, 167–68 (1985). Although University makes allegations of falsehoods and misrepresentations by Defendants to Owen and Rotz (thereby inducing them not to lease to University), there is no such evidence in the record.[15]

Because no reasonable jury could find that Pro–Image intentionally interfered with University's prospective contract, Defendants' motion must be granted as to Count III.

We will issue an appropriate Order.[16]

*ORDER*

AND NOW, this 30th day of January, 1996, upon consideration Defendants' motion for summary judgment, filed November 17, 1995, it is ordered that:

1. Defendants' motion for summary judgment, filed November 17, 1995, is granted.

2. Defendants' motion to compel, filed November 17, 1995, is dismissed as moot.

3. The Clerk of Court shall enter judgment is entered in favor of the Defendants and against the Plaintiff, and shall close this file.

defendant's conduct must be improper." *Yaindl,* 281 Pa.Super. at 581 n. 11, 422 A.2d at 622 n. 11. However, two other panels relied on the four elements set forth in *Thompson* and analyzed the tort with reference to "justification or privilege." *See Vintage Homes, Inc. v. Levin,* 382 Pa.Super. 146, 155, 554 A.2d 989, 994 (1989); *Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.,* 340 Pa.Super. 253, 264, 489 A.2d 1364, 1376 (1985). In *Silver,* the Third Circuit recognized this split, and adopted the latter view because those decisions were more recent. *Silver,* 894 F.2d at 602 n. 5. We note that in *Ruffing,* which was decided after all of the above cases, the court cited the language from *Yaindl,* recited the four factors from *Thompson,* and used the factors set forth in section 767 (relating to "improper" conduct) in determining whether the interference was privileged or justified. This conflict is irrelevant here, as Defendants' conduct was not improper or unjustified under any of these tests.

14. University contends that it made no such threats. However, the issue is not whether the threats were made, but rather whether Pro–Image believed they were made. University has not cast any doubt on Bugelli's testimony on this matter.

15. For example, University asserts that "Bugelli used falsehoods and imaginary grounds to justify to Owen why he should terminate...." [Pl.'s Br. in Opp'n at 11]. Further, University maintains that "Defendants here could not believe their interest (if they existed) would be impaired. They simply tried to damage a competitor by depriving it of a business location out of fear." [Pl.'s Br. in Opp'n at 11]. Finally, University avers that "[t]o take steps as they did, exaggerating, indeed lying about University Graphics and the suspected but unproven motivation of University Graphics cannot be left unaccounted. These acts show beyond doubt the intention to harm. The bottom line is that Pro–Image and MDC scared Owen out of dealing with University Graphics...." [Pl.'s Br. in Opp'n at 12]. However, University fails to identify anything that supports these conclusory statements, and our review of the record has not revealed any such evidence.

16. We do not address Defendant MDC's argument that as the parent company of Pro–Image it had no connection to the allegations in the complaint and is therefore not a proper party to this litigation.