**WINDSOR SECURITIES, INC., Dr. Paul Prusky, Walter G. Arader**

v.

**HARTFORD LIFE INSURANCE COMPANY,**

**Hartford Life Insurance Company, Appellant in 92–1082,**

**Windsor Securities, Inc. and Walter G. Arader, Appellants in 92–1098.**

**Nos. 92–1082, 92–1098.**

United States Court of Appeals, Third Circuit.

Argued Sept. 14, 1992.

Decided Feb. 22, 1993.

---

1. Reliance on drug courier profiles has been sharply challenged when they include constitutionally-relevant factors, such as membership in certain racial groups, or neutral factors arguably unrelated to drug trafficking, such as wearing disheveled clothing or looking "different." *See, e.g., United States v. Taylor*, 956 F.2d 572, 582 n. 2, 586 n. 9 (6th Cir.1992) (Keith, J., dissenting); Sheri Lyn Johnson, *Race and the Decision to Detain a Suspect*, 93 Yale L.J. 214, 234 (1983). *See generally* Morgan Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas*, 65 B.U.L.Rev. 843 (1985).

W. Barry Blum (argued) and Waldemar J. Pflepsen, Jr., Jorden, Schulte & Burchette, Miami, FL, for appellant/cross-appellee Hartford Life Ins. Co.

Peter J. Weidman (argued), Howard J. Kaufman, Kaufman, Coren & Ress, Philadelphia, PA, for appellees/cross-appellants Windsor Securities, Inc. and Walter G. Arader.

Before: STAPLETON, SCIRICA and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this diversity case involving market timing,[1] the sponsor of a mutual fund, Hartford Life Insurance Company, imposed restrictions on investors' ability to effect transfers among fund sub-accounts through third party agents. Plaintiff Windsor Securities, Inc., an investment advisor to Hartford investors, alleged that Hartford's restrictions resulted in tortious interference with its existing contracts. Plaintiff Walter Arader, an investor, alleged that Hartford's imposition of restrictions constituted breach of contract. The district court granted summary judgment to Windsor on the tortious interference with contract claim and to Arader on the breach of contract claim. We will reverse the district court's order on the tort claim and affirm its final judgment on the contract claim.

## I.

## FACTS AND PROCEDURAL HISTORY

### A.

In the early 1980s, Hartford offered for sale under the trade name "Director"[2] an Individual Flexible Premium Variable Annuity Contract. Under its terms the contract owner paid a premium to Hartford which was placed into an account ("Separate Account Two") until the annuity or death benefit was paid or the contract canceled by its owner.

The contract gave each contract owner the right to have premium payments and accumulated earnings placed in seven different sub-accounts of Separate Account Two and to determine the percentage of accumulated earnings and premium payments allocated to each sub-account. Contract owners had the right to "reallocate amounts held in the Sub–Accounts at any time." These sub-accounts were invested in certain mutual funds sponsored by Hartford.[3] Management of the funds was overseen by a board of directors, a majority of which were outside directors.[4]

In 1986, Paul Prusky, an investment advisor and broker, as well as president and sole shareholder of Windsor Securities, Inc., purchased a contract in his own name. Prusky claimed to have been seeking a variable annuity contract which would allow him to make unlimited transfers among sub-accounts on behalf of his clients. Such flexibility was important to his market timing investment strategy.

---

1. "Market timing" is the movement of funds from capital to money markets (or vice versa) based on the "market timer's" evaluation of short-term market conditions.

2. The "Director" later became the "Director II." The parties agree that for purposes of this dispute there are no material differences between the Director and Director II.

3. The contract prospectus provides, "[a]ll of the Funds are sponsored by Hartford Life Insurance Company."

4. The board had eight directors, five of whom were unrelated to any Hartford entity.

After managing his own contract for six months, Prusky solicited his clients to purchase Hartford contracts which he then managed under investment management agreements.

Between June 1987 and March 1989, Prusky managed forty-one contracts on behalf of thirty-five clients pursuant to investment management agreements. Each client's contract application included a form letter to Hartford signed by the purchaser stating that "Prusky or other authorized Windsor Securities personnel" had the contract owner's power of attorney to transfer funds on the contract owner's behalf. The letters also stated that "monies may be moved into any such sub-account available ... as often as Windsor Securities, Inc. deems necessary." Hartford did not object to these letters.

In September 1988, Walter Arader, a Prusky client, purchased three contracts on Prusky's recommendation and executed an investment management agreement with Windsor.

Between June 1987 and May 1990, Prusky managed his clients' contract accounts by telephoning transfer instructions to Hartford and trading on average twice a week. Hartford honored Prusky's trading instructions on behalf of his clients during this period. By the end of May 1990, Hartford had 18,887 contracts in force and Windsor managed contracts on behalf of 45 contract owners.

Beginning in 1988, Hartford and its independent fund advisor, Wellington Management Company, began to observe a negative impact caused by market timing activity: increased trading and transaction costs, disruption of planned investment strategies, forced and unplanned portfolio turnover, lost opportunity costs, and large asset swings in a fund's asset base that adversely affected Hartford's ability to provide maximal investment return to all contract owners.

Hartford monitored market timing activity in 1988 and 1989. In meetings from late 1989 into early 1990, the funds' board of directors was apprised of the adverse effects of market timing upon the funds'

performance. On April 24, 1990, the funds' board determined that market timing harmed contract owners as a whole and adopted a resolution directing Hartford to ameliorate the negative impact of market timing on the funds' performance.

Pursuant to the board resolution, Hartford instituted restrictions calculated to protect the investments of all contract owners. These restrictions required that any third party desiring to effect transfers among sub-accounts on behalf of multiple contract owners, whose aggregate values exceeded $2 million, sign a "Third Party Transfer Services Agreement" ("TPTSA") and obtain a power of attorney from each contract owner in a form acceptable to Hartford. The TPTSA restricted the ability of third parties to transfer funds among the sub-accounts on behalf of contract owners by placing a $5 million cap on the total amount which a third party agent could transfer on behalf of his clients in any given day. The TPTSA also gave Hartford the right to impose additional restrictions upon thirty days prior written notice.

On May 11, 1990, Hartford sent Prusky a letter explaining the restrictions would become effective June 1, 1990. The letter made clear that after June 1, Hartford would no longer accept instructions from any person or firm that had not executed a TPTSA and power of attorney. Prusky (and hence Windsor) refused to accede. On May 14, 1990, Hartford advised Arader of the need for a TPTSA. Arader refused to execute the limited power of attorney or to instruct Prusky to execute the TPTSA.

### B.

Plaintiffs Windsor, Arader, and Prusky sued defendant Hartford in the United States District Court of the Eastern District of Pennsylvania. Windsor alleged Hartford's restrictions tortiously interfered with its management contracts. Prusky made the same claim. Arader claimed the restrictions breached his contract with Hartford.

After the district court denied plaintiffs' motion for a preliminary injunction, all par-

ties moved for summary judgment. In a Memorandum and Order the district court granted summary judgment for plaintiffs Windsor and Arader, and for defendant Hartford on all claims by Prusky.

Subsequently, the district court found that Windsor and Arader failed to mitigate damages. Windsor's award was reduced by one-third, and Arader's award was eliminated entirely. The court entered judgment in favor of Windsor against Hartford in the amount of $265,490 and in favor of Hartford against Arader. These cross-appeals followed.

Hartford appeals the order granting summary judgment of liability and the court's final judgment in favor of Windsor. Windsor and Arader cross-appeal the district court's determinations regarding mitigation.[5]

## II.

## JURISDICTION AND STANDARD OF REVIEW

### A.

The district court had jurisdiction under 28 U.S.C. § 1332(a) (1988). We have jurisdiction under 28 U.S.C. § 1291 (1988). The parties agree that Pennsylvania law controls the resolution of this dispute.

### B.

█ Our standard of review of the district court's entry of summary judgment is plenary. *American Medical Imaging Corp. v. St. Paul Fire & Marine Ins. Co.*, 949 F.2d 690, 692 (3d Cir.1991). Summary judgment may be granted only if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Summary judgment may not be granted, however, where there is disagreement over the inferences that can be reasonably drawn from the facts even if the facts are undis-

puted. *Nathanson v. Medical College of Pa.*, 926 F.2d 1368, 1380 (3d Cir.1991) (citing *Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir.), *cert. denied*, 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985)).

## III.

## THE TORTIOUS INTERFERENCE CLAIM

### A.

█ The district court granted summary judgment to Windsor on its claim that Hartford's restrictions tortiously interfered with its existing contracts. Relying on *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 482 Pa. 416, 393 A.2d 1175 (1978), *cert. denied*, 442 U.S. 907, 99 S.Ct. 2817, 61 L.Ed.2d 272 (1979), the district court held the Pennsylvania Supreme Court would apply § 766A of the Restatement (Second) of Torts and found that Hartford's imposition of the restrictions intentionally and improperly made "Windsor's performance of services for its clients more expensive and/or more burdensome." Section 766A provides:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

Restatement (Second) of Torts § 766A (1979).

The Pennsylvania Supreme Court has explicitly adopted § 766 of the Restatement (Second) of Torts. *Adler, Barish*, 482 Pa. at 429–31, 393 A.2d at 1181–83; *Nathanson*, 926 F.2d at 1388.[6]

Section 766 provides:

---

5. Prusky has not appealed.

6. The *Adler, Barish* court relied on the language used in the Restatement (Second) of Torts § 766 (Tent. Draft No. 23, 1977). As we have previously noted, "the 'final restatement is the same

in substance.'" *Nathanson*, 926 F.2d at 1388 n. 14 (quoting *United States Healthcare v. Blue Cross*, 898 F.2d 914, 925 n. 12 (3d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990)).

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766 (1979). Both § 766 and § 766A involve interference with an existing contract. Section 766 "states the rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff." Restatement (Second) of Torts § 766A cmt. a. Section 766A, by contrast, states the rule where an actor intentionally interferes with "plaintiff's performance of his own contract, either by preventing that performance or making it more expensive or burdensome." *Id.* Thus, the sections focus on different targets of interfering conduct. Section 766 addresses disruptions caused by an act directed not at the plaintiff, but at a third person: the defendant causes the promisor to breach its contract with the plaintiff. Section 766A addresses disruptions caused by an act directed at the plaintiff: the defendant prevents or impedes the plaintiff's own performance.

The leading Pennsylvania case illustrates the application of § 766. In *Adler, Barish*, associates of plaintiff law firm Adler, Barish decided to form their own law practice. Before leaving Adler, Barish, defendants secured a line of credit by using as collateral the anticipated legal fees from Adler, Barish cases on which they were working. After leaving Adler, Barish, defendants waged an active campaign "to induce [plaintiff's] clients to change law firms in the middle of their active cases." 482 Pa. at 427, 393 A.2d at 1181. Applying the Restatement (Second) of Torts § 766, the court found that defendants intentionally and improperly interfered with plaintiff's contractual relations. 482 Pa. at 432–37, 393 A.2d at 1184–86.

*Adler, Barish* makes clear that the Pennsylvania Supreme Court (1) recognizes the inducement variety of contract interference torts and (2) will apply Restatement (Second) of Torts § 766 in analyzing inducement torts. The issue is whether the Pennsylvania Supreme Court, in light of *Adler, Barish*, would adopt § 766A.

*Adler, Barish* involved the paradigm interference tort in which a defendant induces or causes a third party to breach its contract with the promisee-plaintiff. Pennsylvania has long recognized the inducement tort. *See, e.g., Vanarsdale v. Laverty*, 69 Pa. 103 (1871) (affirming judgment against defendants who unjustifiably petitioned school board to terminate plaintiff's employment); *see also Birl v. Philadelphia Elec. Co.*, 402 Pa. 297, 167 A.2d 472 (1960) (allegation that third party made false and malicious statements with purpose and result of inducing employer to terminate employee stated cause of action). The parties have not cited nor have we discovered any Pennsylvania cases recognizing a separate cause of action for preventing or hindering plaintiff's performance of its own contract.[7] The Restatement (First) of Torts (1939), which the Pennsylvania Supreme Court adopted in *Birl*, 402 Pa. 297, 167 A.2d 472, and followed until *Adler, Barish*, did not compre-

---

7. We are aware that some district courts have implicitly assumed that Pennsylvania would adopt (or has adopted) § 766A. *See Batoff v. State Farm Ins. Co.*, 1992 WL 59142, at *5, 1992 U.S. Dist. LEXIS 3501, at *14–*15 (E.D.Pa. Mar. 23, 1992) (noting no Pennsylvania courts have interpreted or applied § 766A; applying and finding no § 766A liability), *vacated on other grounds*, 977 F.2d 848 (3d Cir.1992); *Posner v. Lankenau Hosp.*, 645 F.Supp. 1102, 1114–15 (E.D.Pa.1986) (applying and finding no § 766A liability); *Getty Ref. & Mktg. Co. v. M/T Fadi B*, 595 F.Supp. 452, 456 (E.D.Pa.1984) (§ 766A inapplicable to negligent interference with contract), *aff'd*, 766 F.2d 829 (3d Cir.1985); *Eisele v. Holloway (In re Eisele)*, 125 B.R. 922, 928–32 (Bankr.W.D.Pa.) (applying and finding liability under § 766A), *aff'd in part, vacated in part*, 132 B.R. 696 (W.D.Pa.1991), *aff'd mem.*, 968 F.2d 13 (3d Cir.1992). None of these cases cited a Pennsylvania case adopting § 766A. Nor did any predict that the Pennsylvania Supreme Court would recognize a cause of action under § 766A.

hend the tort described by § 766A.[8]

Windsor contends that *Adler, Barish* represented a § 766A action of sorts since the court found that plaintiff was prepared to perform services for its clients but unable because of defendants' interference. 482 Pa. at 434, 393 A.2d at 1184. But this attempt to shoehorn an inducement tort into a § 766A action is unconvincing. For in every instance that a third party induces a promisor to breach its contract, the plaintiff-promisee will be unable (or unwilling) to perform. The gist of the action in *Adler, Barish* was not plaintiff's performance but defendants' conduct in intentionally and wrongfully enticing away plaintiff's clients. Although Windsor urges us to predict that the Pennsylvania Supreme Court would adopt § 766A, we think this outcome is far from clear.

Initially, we note Pennsylvania has not adopted *in toto* the Restatement (Second) of Torts approach to economic interference torts. For example, the Pennsylvania Supreme Court has not adopted § 776B of the Restatement (Second). *See Advent Sys. Ltd. v. Unisys Corp.*, 925 F.2d 670, 673 (3d Cir.1991); *Silver v. Mendel*, 894 F.2d 598, 601 (3d Cir.1990) ("the Pennsylvania Supreme Court ... has not adopted the Re-

statement (Second)'s formulation with respect to interference with *prospective* contractual relations."), *cert. denied*, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

We also note the two tort theories embodied in §§ 766 and 766A may have different effects and justifications. In the § 766 inducement case, the effect of tort liability is to encourage voluntary transactions.[9] If an "inducer" wishes to receive a promisee's promised advantage, then the inducer must bargain directly with the promisee. This "bargain-forcing" aspect of inducement liability protects the security of transactions, reduces monitoring costs, encourages consensual rearrangements of contractual obligations, and avoids the negotiation and litigation costs that arise where an inducer causes a promisor to breach its contract with its promisee.

However, in the § 766A "hindrance" case, this "bargain-forcing" justification appears absent. Imposition of liability under this theory does not encourage the third party to bargain with the promisee. In cases where a third-party's conduct "burdens" but does not prevent the plaintiff-promisor's performance, plaintiff's performance is rendered more expensive.[10]

---

**8.** The Restatement (First) of Torts § 766 (1939) provides:

> one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
> (a) perform a contract with another, or
> (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby.

The tort of preventing or hindering another's performance of his own contract first appears as § 766(2) of Restatement (Second) of Torts (Tent. Draft No. 14, 1969). In 1969, then reporter Dean William Prosser presented a proposed draft on "Interference with Business Relations" for inclusion in the Restatement (Second) of Torts. But in presenting Tentative Draft No. 14, "Dean Prosser ran into overwhelming opposition to § 766" on the American Law Institute floor. Restatement (Second) of Torts note to Institute, at 2 (Tent. Draft No. 23, 1977). Prosser concluded that the draft required reexamination. *Id.* at vii (Foreword, H. Wechsler). Prosser retired as reporter in 1970 without preparing a revision. *Id.* note to Institute, at 1. When the rest of the Restatement (Second) had been prepared it was discovered that chapter 37, on intentional interference with advantageous

economic relations, had not been resubmitted to the Institute for approval. *Id.* at vii. Dean John Wade, then reporter for the project, presented a reformulation to the Institute in 1977. *Id.* In its 1977 meeting, the director of the Institute, Herbert Wechsler, advised the Institute that it was "essential to perfect [the draft] at this meeting, since the rest of volume IV of the Torts Restatement, Second, is now ready for press." *Id.*

**9.** *See* Lillian R. BeVier, *Reconsidering Inducement*, 76 Va.L.Rev. 877, 881 n. 10, 889 n. 46, 893, 896, 915–29 (1990); Richard A. Epstein, *Inducement of Breach of Contract as a Problem of Ostensible Ownership*, 16 J. Legal Stud. 1, 30–33 (1987).

**10.** Section 766A permits interference liability where defendant renders plaintiff's performance more expensive. Recently, the Supreme Court of Wyoming was faced with a case in which the plaintiff's performance was rendered more costly by defendant's interference. *Price v. Sorrell*, 784 P.2d 614 (Wyo.1989). Although Wyoming had previously adopted Restatement (Second) of Torts §§ 766 and 766B, the court declined to adopt § 766A. The court reasoned

The question becomes not whether plaintiff will perform but rather at what cost. This dispute does not involve the promisee.

In cases where plaintiff's performance is prevented, the third party's actions are directed at the plaintiff-promisor. Yet where the defendant prevents plaintiff's performance, plaintiff will presumably not be a. willing participant.[11] Generally, such cases will involve force, fraud, or other independently actionable conduct; adverse effects on contract rights will become an element of damages subject only to the usual limitations of causation, mitigation, and reasonable certainty. As Professor Prosser points out,

> [t]he bulk of the cases involving interference as distinct from inducement involve ... physical interference with person or property and also involve the commission of some independent tort, as where the defendant interferes with the plaintiff's rights by converting goods to which the plaintiff was entitled under the contract, or commits an injurious falsehood of the kind sometimes called slander of title. Methods tortious in themselves are of course unjustified and liability is appropriately imposed where the plaintiff's contract rights are invaded by violence, threats and intimidation, defamation, misrepresentation, unfair competition, bribery and the like. Constitutional violations have been put in the same category. Thus in many cases interference with contract is not so much a theory of liability in itself as it is an element of damage resulting from the commission of some other tort, or the breach of some other contract.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 129, at 992 (5th ed. 1984) (footnotes omitted) (emphasis added); *see also* Dan B. Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark.L.Rev. 335, 336 n. 10, 365–73 (1980); Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 99–105 (1982).

Thus, in non-inducement cases, expanding the tortious interference principle to recognize a § 766A "hindrance" cause of action may duplicate protection already afforded through tort and contract. But duplication comes at a cost. It risks chilling socially valuable conduct and creates new liability of uncertain dimensions. Some commentators have criticized the amorphous nature of the tortious interference principle, warning that its expansion is ill-conceived, threatening both fairness and efficiency.[12] These concerns counsel some

---

that rendering a performance more costly or burdensome "as an element of proof is too speculative and subject to abuse to provide a meaningful basis for a cause of action." 784 P.2d at 616.

11. The language of the Restatement (Second) supports this view. Section 766A speaks of the defendant's "preventing" performance, whereas § 766 speaks of the defendant's "inducing" non-performance. *See* Harvey S. Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 100 n. 167 (1982).

12. *See, e.g.,* Dan B. Dobbs, *Tortious Interference with Contractual Relationships*, 34 Ark.L.Rev. 335 (1980) (present doctrine contrary to integrity of legal system, to fairness, to interests in free speech, and to efficiency); Donald C. Dowling, *A Contract Theory for a Complex Tort: Limiting Interference with Contract Beyond the Unlawful Means Test*, 40 U. Miami L.Rev. 487 (1986) (present doctrine overbroad and inefficient); Perlman, *supra* note 11 (same); James B. Sales, *The Tort of Interference with Contract: An Argument for Requiring a "Valid Existing Contract"*

*to Restrain the Use of Tort Law in Circumventing Contract Remedies*, 22 Tex.Tech.L.Rev. 123 (1991) (present doctrine "hampers commercial activity" and undermines integrity of contract remedies); Francis Bowes Sayre, *Inducing Breach of Contract*, 36 Harv.L.Rev. 663, 685–86 (1923) (expansive tort protection of contract rights may sacrifice more valuable interests); Gina M. Grothe, Note, *Interference with Contract in the Competitive Marketplace*, 15 Wm. Mitchell L.Rev. 453 (1989) (expanded interference liability subverts free competition and should be limited); Robert S. Epstein, Note, *Interference with Contractual Relations: A Property Limitation*, 18 Stan.L.Rev. 1406 (1966) (finding extension of tort to cover injury that merely increases the cost or diminishes the benefit of a party's performance problematic). *But see* John Danforth, Note, *Tortious Interference with Contract: A Reassertion of Society's Interest in Commercial Stability and Contractual Integrity*, 81 Col.L.Rev. 1491 (1981) (generally supporting expanded tortious interference liability).

caution in expanding tortious interference liability.

We need not decide, however, whether the Pennsylvania Supreme Court would embrace or reject § 766A. For even if Pennsylvania would adopt § 766A, we believe Hartford cannot be held liable under that section for the reasons expressed below.

### B.

■ Assuming the Supreme Court of Pennsylvania would adopt § 766A, we must determine whether Hartford's conduct in imposing the restrictions on third party transfers constituted tortious interference with Windsor's investment management contracts. Windsor had the burden of establishing (1) a contractual relationship; (2) Hartford's intent to harm Windsor by interfering with contractual relations; (3) the impropriety of the interference; (4) harm resulting from the conduct. *See Nathanson,* 926 F.2d at 1388 (citing *Buczek v. First Nat'l Bank of Mifflintown,* 366 Pa.Super. 551, 557, 531 A.2d 1122, 1124 (1987)).

Following this analysis, the district court found Hartford intentionally interfered with Windsor's contractual relations with its clients. The district court found that although Hartford acted pursuant to legitimate business motives, it nevertheless acted improperly by imposing the restrictions. Finally, the district court concluded that Windsor suffered harm since the restrictions made its management of client assets more costly and/or burdensome.

On appeal, Hartford contends the district court erred in determining that Hartford's interference was "improper" since the district court found that Hartford was "motivated by a genuine desire to protect legitimate business interests" and because Hartford did not employ independently wrongful means in interfering. Hartford argues that this Court "has repeatedly held that a party that acts with a valid business purpose cannot be liable for tortious interference because the conduct complained of cannot be found to be 'improper' under § 767."

### 1. Propriety of Hartford's Conduct Under Section 767

In determining whether an actor's conduct is "proper," Pennsylvania courts are guided by the following factors derived from the Restatement (Second) of Torts § 767 (1979):

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference, and

(g) the relations between the parties.

*Nathanson,* 926 F.2d at 1388–89 (citing *Adler, Barish,* 482 Pa. at 433, 393 A.2d at 1184 and *Yaindl v. Ingersoll–Rand Co.,* 281 Pa.Super. 560, 573–74, 422 A.2d 611, 618 (1980)). Whether an alleged interference is improper entails a "case-by-case inquiry." *Green v. Interstate United Management Serv. Corp.,* 748 F.2d 827, 831 (3d Cir.1984).

"The nature of a defendant's conduct is a chief factor in determining whether the conduct is improper or not." Restatement (Second) of Torts § 767 cmt. c. According to Windsor:

There are two types of tortious interference claims—(1) those in which the conduct of the defendant is *independently wrongful* ...; and (2) those in which the defendant's conduct was *not* independently wrongful.... Our case falls into the *former* category, since the misconduct at issue in Windsor's claim for tortious interference with contract also constitutes, independently, a breach of the Director II contracts as against Windsor's clients.

We find Windsor's argument untenable. "Wrongful" conduct requires something more than mere breach of contract. Comment d of § 767, to which Windsor draws our attention, provides in part:

If the conduct is *independently wrongful—as, for example, if it is illegal* because it is in restraint of trade *or if it is tortious* toward the third person whose conduct is influenced—the desire to interfere with the other's contractual relations may be less essential to a holding that the interference is improper.

(emphasis added). Comment d describes "independently wrongful" as conduct that is "illegal" or "tortious." But breach of contract rises to neither of these levels.

■ Breach of contract, without more, is not a tort. *See Glazer v. Chandler,* 414 Pa. 304, 308 n. 1, 200 A.2d 416, 418 n. 1 (1964) ("To permit a promisee to sue his promisor in tort for breaches of contract *inter se* would erode usual rules of contractual recovery and inject confusion into our well-settled forms of actions. Most courts have been cautious about permitting tort recovery for contractual breaches and we are in full accord with this policy"); [13] *see also* 3 E. Allan Farnsworth, *Contracts* § 12.8, at 194–95 (2d ed. 1990) ("Most courts have not infringed on the freedom to keep or to break a contract traditionally afforded a party by the common law and endorsed by the notion of efficient breach.") (citations omitted).

■ Breach of contract is not "illegal" either under common usage or under comment d to § 767. *Cf.* John E. Murray, Jr., *Murray on Contracts,* § 117, at 672 (3d ed. 1990) ("It is conceivable ... for a legal system to compel the enforcement of promises through its criminal law or at least to allow recoveries to injured promisees which go beyond mere compensation. But the Anglo–American legal system has not chosen this route.") Comment d lists violation of antitrust law as an example of "illegal" conduct. Comment c to § 767 describes "unlawful" conduct as:

Conduct specifically in violation of statutory provisions or contrary to established public policy.... [F]or example, ... conduct that is in violation of antitrust provisions or is in restraint of trade or

conduct ... that is in violation of statutes, regulations, or judicial or administrative holdings regarding labor relations.

"Unlawful" or "illegal" conduct under § 767 contemplates more than mere breach of contract between private parties. The comments to § 767 do not support Windsor's contention that breach of contract *ipso facto* constitutes independently wrongful conduct.

Nor do any of the cases advanced by Windsor demonstrate that breach of contract constitutes "independently wrongful" conduct. They suggest the opposite conclusion. All involve innately wrongful conduct such as torts, deprivation of civil rights, and violation of ethical codes. *See Silver v. Mendel,* 894 F.2d 598 (3d Cir.), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990) (alleged conduct of defendant in maliciously ·filing involuntary bankruptcy petition against plaintiff without probable cause stated cause of action for improper interference with contract *as well as* intentional infliction of emotional distress); *Roe v. Operation Rescue,* 710 F.Supp. 577 (E.D.Pa.1989), *modified,* 919 F.2d 857 (3d Cir.1990) (defendants' conduct in blockading abortion clinics constituted improper interference *as well as* trespass and violation of patients' civil rights); *Adler, Barish,* 482 Pa. 416, 393 A.2d 1175 (conduct of former associates, in soliciting clients of former firm, held to constitute improper interference *and* violation of attorney disciplinary rules).

The concept of independently wrongful conduct becomes useless if breach of contract alone constitutes independently wrongful conduct under § 767. Most interferences with contract and every instance of successful inducement entail a breach of contract.

In sum, we are persuaded that Hartford's conduct in imposing the restrictions was neither tortious nor illegal. Because there is no evidence that Hartford's conduct was *wrongful* by any measure exter-

---

**13.** Windsor's argument is especially unpersuasive since Windsor was neither a party nor an intended beneficiary of the allegedly breached contract between Windsor's clients and Hartford.

nal to the interference itself, we conclude that Hartford's conduct was not wrongful.

### 2. Hartford's Legitimate Business Motive and Interests

Our cases accord substantial deference to defendants whose conduct, despite its conflict with plaintiff's interest, protects an existing legitimate business concern.

Thus, in *Nathanson v. Medical College of Pennsylvania*, we attached significance to the fact that defendant's interfering conduct was directed at protecting its legitimate business interests. 926 F.2d 1368 (3d Cir.1991). There, a medical student admitted to defendant MCP, after matriculating, obtained a one-year leave of absence. *Id.* at 1373. During the course of her leave, the student applied and was accepted to Georgetown Medical School. When MCP learned of her acceptance to Georgetown, MCP informed Georgetown that plaintiff held a position in MCP's entering class. *Id.* at 1376. Georgetown subsequently withdrew its offer of admission and plaintiff sued MCP for tortious interference based on MCP's communication with Georgetown.

The district court, emphasizing the interests sought to be advanced by MCP, found that MCP had acted to "protect[ ] its own contractual interest." *Id.* at 1388 (relying on § 767(d)). We affirmed the district court, observing that "MCP was simply complying with the standard 'traffic rules' followed by medical schools...." *Id.* at 1391.

We also emphasized the importance of allowing actors freedom to protect their legitimate business interests in *Green v. Interstate United Management Services Corp.*, 748 F.2d 827 (3d Cir.1984). There, the defendants determined that their wholly-owned subsidiary had entered "a bad bargain" when it negotiated a lease with plaintiff. The defendants instructed their subsidiary not to sign the lease even though the subsidiary had orally agreed to sign. Overturning a jury verdict of tor-

tious interference, we reasoned that defendants' "motive, plainly, was to prevent dissipation of the resources of their wholly-owned subsidiary. In this case, 'the social interests in protecting the freedom of the actor' outweigh 'the contractual interests of the other.'" *Id.* at 831 (quoting § 767(e)). Thus, in the context of relations between parent and subsidiary corporations, we recognized an important interest under § 767(e) in allowing an actor freedom to protect its legitimate financial interests notwithstanding the fact that such action resulted in breach of a third party's contract.

In *Advent Systems Ltd. v. Unisys Corp.*, we followed the reasoning of *Green*[14] in a prospective contractual relations case where the parent pressured its subsidiary to terminate contract negotiations. 925 F.2d 670 (3d Cir.1991). We reasoned that the parent's "interest in the financial stability of its subsidiary and the need to avoid a situation where the two would be working at cross-purposes justified the disruption of negotiations with [plaintiff]." *Id.* at 673.

*Green, Advent,* and *Nathanson* support Hartford's contention that where an actor is motivated by a genuine desire to protect legitimate business interests, this factor weighs heavily against finding an improper interference. These cases also make clear the social interest in allowing an actor freedom to protect its legitimate business interests. *See* Restatement of Torts (Second) § 767(e).

Here the district court analyzed Hartford's motive in implementing the restrictions and concluded that Hartford was actuated by a genuine desire to protect its own financial interests and those of non-market timer contract owners, toward whom Hartford bore a fiduciary obligation. Hartford clearly had a proper motive.

Hartford also sought to advance important and legitimate business interests. Hartford and its independent fund advisor, Wellington Management Company, deter-

---

**14.** Although Pennsylvania had not adopted Restatement (Second) of Torts § 766B dealing with prospective relations, this Court neverthe-

less was guided by *Green's* use of § 767. *Advent,* 925 F.2d at 673.

mined that market timing caused increased trading and transaction costs, disruption of planned investment strategies, forced and unplanned portfolio turnover, lost opportunity costs, and subjected a fund's asset base to large asset swings that diminished a fund's ability to provide a maximized return to all contract owners.

Hartford's concern with market timing was understandable. Market timer contracts represented only a small fraction of Hartford's 18,887 contracts, but the risks and costs associated with market timing were borne by all contract owners—few shared in market timing's benefits yet all bore its costs.[15] As a fiduciary charged with protecting the interests of all contract owners, Hartford sought to eliminate or diminish the adverse consequences timing activity imposed on contract owners. Hartford monitored the effects of market timing on the funds for two years and concluded it had a negative impact on the management and integrity of the funds. Hartford's independent fund advisor, Wellington, and the funds' board of directors reached the same conclusion.

These concerns were shared by others in the mutual fund industry and noted by the Securities and Exchange Commission. *See* Offers of Exchange Involving Registered Open-End Investment Companies and Unit Investment Trusts, Investment Company Act Rel. No. IC–16504, 53 Fed.Reg. 30,299, 30,301, 30,307 (1988). During the period Hartford devised and implemented its restrictions, other mutual funds such as Fidelity Investments and Vanguard Group began imposing "anti-timer" restrictions to mitigate the perceived negative effects of unrestricted timing activity.[16]

Given our conclusion that the nature of Hartford's conduct was not independently wrongful, and the interests Hartford sought to advance were legitimate, we believe that the district court attached inadequate significance to its finding that Hartford acted with a legitimate business motive.

In sum, nothing indicates that the interests Hartford sought to advance were illegitimate, or that Hartford, in advancing these interests, acted with an improper motive or through impermissible means. Others in the mutual fund industry shared Hartford's concern with market timing's untoward effects. For these reasons, we hold that Hartford's conduct in imposing the restrictions did not constitute improper interference. We therefore will reverse summary judgment on the tortious interference with contract claim and direct entry of summary judgment in favor of Hartford.

## IV.

## BREACH OF CONTRACT CLAIM

The district court determined that Hartford's imposition of restrictions breached

---

**15.** As of May 31, 1990, there were 18,887 contracts in force. Of this total, market timers managed approximately 413 contracts, including 45 owned by Windsor clients. Thus, market timer client contracts accounted for 2% of all contracts, with Windsor managing 0.2% of total contracts and 11% of all market timing managed contracts.

However, while market timer contracts represented a small proportion of total contracts, they accounted for a disproportionate share of the volume and frequency of transfers. For example, during the period from January 1, 1990, through May 31, 1990, 98% of all contracts were non-market timer client contracts. These contracts averaged only 0.14 transfers per contract, accounted for 34.6% of the transfers, and only 9.2% ($48 million) of the aggregate values transferred. During this same period, market timer client contracts, representing only 2% of all contracts, averaged 11.5 transfers per contract, accounted for 65.4% of the transfers, and 90.8% ($471 million) of the aggregate values transferred. Contracts owned by Windsor clients, representing 0.2% of all contracts, averaged 41.9 transfers per contract, accounted for 26% of all transfers, and 78% ($405 million) of the aggregate values transferred.

Hartford produced unrebutted testimony that absent inordinate success, market timing strategy generally cannot be implemented for market timing customers on an individual account basis since transaction costs "would soon [leave] little asset value to transfer.... By using the mechanism of a mutual fund for the shifting of assets, however, a market timer forces all investors in a mutual fund to bear the excessive trading and transaction charges."

**16.** *See* Michael Siconolfi, *IRS Lets Fund Group Put Brakes on Always-Moving Market Timers,* Wall St. J., Jan. 17, 1989, at C1.

its contract with Arader. Alternatively, it held that Hartford, through its representations and conduct, waived any contractual condition that Hartford would only honor transfers among sub-accounts if made by Arader personally. We believe the district court correctly construed the contested contractual language.

### A.

The contract interpretation dispute centers on the meaning of the "sole power" clause in the contract. In the first paragraph, under the heading "CONTRACT CONTROL PROVISIONS" and the subheading "Annuitant, Contingent Annuitant, Contract Owner and Beneficiary," the contract provides:

> The Annuitant and Contingent Annuitant may not be changed.
>
> The designations of Contract Owner and Beneficiary will remain in effect until changed by the Contract Owner. Changes in the designation of the Contract Owner and Beneficiary may be made during the lifetime of the Annuitant by written notice to the Company. If the Beneficiary has been designated irrevocably, however, such designation cannot be changed or revoked without such Beneficiary's written consent. Upon receipt of such notice and written consent, if required, at the offices of the Company, the new designation will take effect as of the date the notice is signed, whether or not the Annuitant or Contract Owner is alive at the time of receipt of such notice. The change will be subject to any payments made or other action taken by the Company before the receipt of the notice.
>
> *The Contract Owner has the sole power to exercise all rights, options and privileges granted by this contract or permitted by the Company and to agree with the Company to any change in or amendment to the contract.* The rights of the Contract Owner shall be subject to the rights of any assignee of record with the Company and of any irrevocably designated beneficiary. Except with respect to the Termination Provisions, joint Con-

tract Owners may provide that each Contract Owner alone may exercise all rights, options and privileges.

(emphasis added).

The question faced by the district court was whether the "sole power" clause meant that *only* the contract owner could exercise rights under the contract. Hartford contends that the "sole power" clause meant an "exclusion of all other parties, third parties," and did not permit exercise of the contract owner's rights through an agent. Arader, on the other hand, contends that the "sole power" clause meant "that the contract owner, as distinct from the beneficiary, the annuitant and the contingent annuitant ... may exercise the rights granted by the contract, such as the right to transfer funds among sub-accounts" and permitted the contract owner to exercise rights through an agent.

The district court accepted Arader's interpretation, reasoning that (1) the "sole power" clause should be read in context of a subheading entitled "Annuitant, Contingent Annuitant, Contract Owner and Beneficiary"; (2) it was reasonable to conclude that the "sole power" clause was intended to exclude the exercise of contractual powers by the beneficiary, the annuitant or the contingent annuitant; and (3) the "sole power" clause was not intended to limit the contract owner's ability to exercise his rights through an agent. We agree.

■ In interpreting contractual language, our paramount task is to ascertain and give effect to the contracting parties' objectively manifested intent. *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001, 1009 (3d Cir.1980). "The strongest external sign of agreement between contracting parties is the words they use in their written contract." *Id.*

■ Our examination of the words and context of the "sole power" clause convinces us that it cannot reasonably be read as restricting Arader's common law right to act through an agent. The sole purpose of the section of the contract in which this clause is found, as its heading indicates, is to define the relationship among the "Con-

tract Owner," the "Beneficiary," the "Annuitant," and the "Contingent Annuitant" and the relationship between those parties and Hartford. Fairly read in this context, the "sole power" clause simply does not speak to whether the contract owner can exercise his rights under the contract through an agent. This is apparent not only from the text of this section, but also from the fact that another part of the agreement anticipates that the "Contract Owner" will have the right to vote by proxy and the fact that his "registered representative" can direct Hartford to make transfers of funds.

Accordingly, we will affirm the district court's finding that Hartford breached its contractual obligation to Arader.[17] However, we will also affirm the district court's final judgment in favor of Hartford on Arader's contract claim because any award of damages to Arader could have been based only on speculation.

### B.

Subsequent to Hartford's June 1, 1990 implementation of the TPTSA, Arader transferred his assets into the money market fund where they remained until August 5, 1991. At trial, Hartford presented evidence that Arader neglected to undertake appropriate measures to avert losses but instead enhanced damages through inaction. The district court entered judgment for Hartford on Arader's claim based on these findings of fact:

> Arader himself could have taken steps to mitigate his potential damages. He declined to do so. Hartford has the burden of proof on the issue of mitigation. I find the steps suggested by Hartford in its proposed findings of fact and conclusions of law which Arader could have taken to be without [un]due risk, expense or humiliation. He is therefore precluded from recovery in that he made no reasonable effort to avoid loss. My conclusion that he cannot recover is based upon my inability as a fact finder to determine his loss, if any, except by

guessing at what may have happened if he tried to mitigate his damages.

These findings of fact are not clearly erroneous.

■ Arader is a financial consultant specializing in mergers and acquisitions and formerly served as a commissioner of the Pennsylvania Securities Commission. His son, Alexander Arader, is also a financial consultant and was the "registered representative" on both of Arader's accounts with Hartford. Arader claims that he contracted for the right to have Windsor tell Hartford when to move the funds in his accounts from the capital market to the money market and back and that Hartford's revised policy deprived him of this right. It is undisputed, however, that after the new policy was initiated, Arader, either personally or through his "registered representative," retained the right to tell Hartford at any time to make such transfers. Since Arader also retained the right to receive Windsor's market timing advice each day, one of the avenues of mitigation which the district court found he could have pursued without undue risk, expense, or humiliation was an arrangement under which he or his son would call Windsor in the late afternoon and then relay that advice, in the form of an instruction, to Hartford before the 4:00 p.m. deadline. While Arader argues that he was a very busy man and that there were occasions when Prusky did not make a final decision until 3:59 p.m., we are unwilling to say the district court was clearly erroneous in concluding that this was a reasonable means for Arader to put himself in the same economic position he would have been in had there been no new policy.

It seems self-evident that reasonable efforts of this kind would have kept Arader from losing anything in the market that he would otherwise have had, had Hartford lived up to its promise to take orders directly from Windsor. If he had made such efforts and it had turned out that there was a decision Prusky made so late in the day that he could have communicated it directly but not through an intermediary,

---

**17.** In light of this conclusion, we need not address whether Hartford waived a right to deal

with Arader solely on a personal basis.

Arader would be entitled, of course, to recover any loss occasioned thereby. Since Arader failed to make these efforts, however, it is not now feasible to determine whether such an occasion would have arisen and, if so, what loss would have been incurred. All that can be said is that the likelihood of any such loss seems sufficiently remote that any award attributable to that possibility would be speculative indeed. Finally, the rather unusual facts of this case suggest that Arader would not have incurred any significant expense in making reasonable efforts to mitigate in this manner. If he believed significant expense would have been incurred, he should have come forward with some evidence of that expense. Having failed to do so, he cannot complain about the district court's failure to make an award of damages on that basis.

## V.
## CONCLUSION

For the foregoing reasons, we will reverse the district court's grant of summary judgment in favor of Windsor on the tortious interference claim and we will direct entry of judgment in favor of Hartford. We will affirm the district court's final judgment in favor of Hartford on Arader's contract claim.