Smart Online, Inc. v. OpenSite Technologies, Inc., 2003 NCBC 5

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA | | IN THE GENERAL COURT OF JUSTICE |
| | | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | | FILE NO. 01 CVS 09604 |

| | | |
|---|---|---|
| | ) | |
| SMART ONLINE, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER ON DEFENDANTS'** |
| | ) | **MOTION TO DISMISS** |
| OPENSITE TECHNOLOGIES, INC., | ) | **PORTIONS OF PLAINTIFF'S** |
| SIEBEL SYSTEMS, INC., KIP FREY, | ) | **THIRD AMENDED** |
| R.E. WIDIN, STEVE GOLDSMITH, | ) | **COMPLAINT** |
| KIRK LEIBERT and KIRK HOUSE. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

{1}     THIS MATTER came before the undersigned on defendants' motion pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure to dismiss Smart Online, Inc.'s ("Smart Online") claims in the Third Amended Complaint for breach of contract and breach of express warranty arising out of the version number of the computer software, and the allegation that Defendant OpenSite Technologies, Inc. ("OpenSite") verbally represented that the OpenSite software ("Software") could handle three to five thousand bids or transactions simultaneously.  Defendants also ask the Court to dismiss plaintiff's claims for the following damages:  (1) $145,000 paid to Dynamic Quest for implementation of the Software; (2) $1,935,900 paid to acquire Assets2Auction; (3) $1,817,000 paid to acquire e4close.com; (4) $3,823,000 in costs associated with expansion of Smart Online's business; and (5) additional damages based upon loss of revenue.  Defendants have asked the Court to limit Smart Online's recoverable damages to $121,659, the amount plaintiff paid to license the software.

{2}     For the reasons set forth below, the Court GRANTS defendants' motion to dismiss the damage claims for the acquisition of Assets2Auction and e4close.com; and, at this stage, the Court DENIES defendants' remaining motions to dismiss plaintiff's claims.

*Harris & Winfield, LLP by Donald J. Harris, for plaintiff.*

*Hunton & Williams by Matthew P. McGuire, Heather Bell Adams, and L. Neal Ellis, for defendants.*

## I.
## BACKGROUND AND PROCEDURAL HISTORY

{3}     This dispute arises out of Plaintiff Smart Online's licensing of Defendant OpenSite's software.  Smart Online is an online provider of internet business applications.  In March 2000, Smart Online and Defendant OpenSite entered into a software license agreement ("License Agreement") whereby Smart Online would utilize OpenSite's Software for its auction web site.  In May 2000, Defendant Siebel Systems, Inc. ("Siebel") acquired OpenSite as a wholly owned subsidiary.  Allegations regarding the promised capabilities of the Software form the heart of this dispute.

{4}    Smart Online filed this action in Wake County on August 7, 2001.  In its complaint, Smart Online sought relief for breach of contract, breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, civil conspiracy, unfair and deceptive trade practices, negligent misrepresentation and fraud.  Plaintiff further sought punitive damages.  Defendants filed a motion to dismiss on May 1, 2002, and on June 21, 2002 Smart Online moved to amend its complaint.  The Court granted Smart Online's motion to file an amended complaint on June 26, 2002, at which time plaintiff filed its amended complaint.  Defendants challenged the amended complaint under Rule 12(b)(6).

{5}    After a hearing, the Court entered an October 15, 2002 Order dismissing plaintiff's claims for breach of implied warranties of merchantability and fitness for a particular purpose; the Order limited contract damages and granted plaintiff thirty days to amend its complaint to address the particularity requirements for fraud, rescission and misrepresentation damages.  Smart Online filed its Third Amended Complaint on November 14, 2002.  Defendants filed a Rule 12(b)(6) motion directed to the Third Amended Complaint on December 12, 2002; plaintiff responded on December 23, 2002.  The Court held oral arguments on March 13, 2003.

## II.
## LEGAL STANDARD ON MOTION TO DISMISS

{6}    When ruling on a motion to dismiss under Rule 12(b)(6), the court must determine "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted."  *Harris v. NCNB*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987).  In ruling on a motion to dismiss, the court must treat the allegations in the complaint as true.  *Hyde v. Abbott Laboratories, Inc.*, 123 N.C. App. 572, 574-75, 473 S.E.2d 680, 682 (1996).  The court must construe the complaint liberally and must not dismiss the complaint unless it appears to a legal certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim.  *Id.*  For purposes of a motion to dismiss, a copy of any written instrument attached as an exhibit to a pleading is considered part of the pleading.  N.C. R. Civ. P. 10(c) (2001).  Thus, the court may consider exhibits attached to a complaint without converting a motion to dismiss into a motion for summary judgment.  *See Praxair, Inc. v. Airgas, Inc.,* 1999 NCBC 5, at ¶ 6 (No. 98 CVS 8571, Mecklenburg County Super. Ct. May 26, 1999) (Tennille, J.)); *see also Governor's Club Inc. v. Governor's Club Ltd., P'ship,* 152 N.C. App. 240, 254, 567 S.E.2d 781, 790 (Aug. 20, 2002) (citing *Stanback v. Stanback,* 297 N.C. 181, 254 S.E.2d 611, *rev'd in part on other grounds,* 297 N.C. 181, 254 S.E.2d 611 (1979)).

## III.
## BREACH OF CONTRACT

{7}    Article 2 of the Uniform Commercial Code as adopted by North Carolina ("UCC") applies to "transactions in goods."  N.C.G.S. §25-2-102 (2002).  The UCC defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (article 8) and things in action."  N.C.G.S. §25-2-105(1).

{8}    Where a contract is a mixed contract, in that it compasses both the sale of a good and the provision of services, our Court of Appeals has expressly adopted the "predominant factor" test to determine whether the UCC applies.  *Hensley v. Ray's Motor Company of Forest City, Inc., d/b/a Applegate*

*Mobile Homes,* No. COA02-712, 2003 N.C. App. LEXIS 1050, at *8-9 (June 3, 2003) (adopting the test set forth in *Bonebrake v. Cox,* 499 F.2d 951 (8th Cir. 1974)) (citing *Batiste v. Home Products Corp.,* 32 N.C. App. 1, 6, 231 S.E.2d 269, 272 (1977); *HPS, Inc. v. All Wood Turning Corp,* 21 N.C. App. 321, 324, 204 S.E.2d 188, 189 (1974)). The predominant factor test states:

> [the] test for inclusion or exclusion is not whether [the sale of goods and the provision of services] are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved . . . or is a transaction of sale, with labor incidentally involved . . ..

*Id.* at * 8-9 (quoting *Bonebrake,* 499 F.2d at 960) (alterations in original).[1]

{9}  Courts have examined several factors under this test but have not found any one factor to be dispositive of the issue. *BMC Industries, Inc., v. Barth Industries, Inc.,* 160 F.3d 1322, 1330 (11th Cir. 1998) ("Although courts generally have not found any single factor determinative in classifying a hybrid contract as one for goods or services, courts find several aspects of a contract particularly significant."). Some of those factors include: "(1) the language of the contract, (2) the nature of the business of the supplier, and (3) the intrinsic worth of the materials." *Hensley,* 2003 N.C. App. LEXIS 1050, at *10 (quoting *Princess Cruises, Inc. v. General Electric Co.,* 143 F.3d 828, 833 (4th Cir. 1998); *Parks v. Alteon, Inc.,* 161 F. Supp. 2d 645, 649 (M.D.N.C. 2001)).

{10} Other jurisdictions have placed great weight on the language of the contract and the manner in which the contract was billed. *BMC,* 160 F. 3d at 1330 ("[T]he language of the contract itself provides insight into whether the parties believed the goods or services were the more important element of their agreement. . . . when the contract price does not include the cost of services, or the charge for goods exceeds that for services, the contract is more likely to be for goods."); *see also, Bonebrake,* 499 F. 2d at 958 (stating that language referring to "equipment" is peculiar to goods rather than services); *Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F. Supp. 737, 743 (2d Cir. 1979) (stating that a bill that does not include services indicates a contract for goods); *Lincoln Pulp & Paper Co. v. Dravo Corp.,* 436 F. Supp. 262, 275 and n. 15 (D.Me. 1977) (holding that the contract at issue was for services after noting that the bill did not allocate costs between services and goods, and the evidence showed that the cost of the goods was less than half of the contract price); *Bailey v. Montgomery Ward & Co.,* 690 P.2d 1280, 1282 (Colo. Ct. App. 1984) (holding that a contract that identifies the transaction as a purchase and one of the parties as the customer signals a transaction in goods); *Meeker v. Hamilton Grain Elevator Co.,* 110 Ill. App. 3d 668, 442 N.E.2d 921, 923, 66 Ill. Dec. 360 (Ill. App. Ct. 1982) (stating that a contract that calls the parties seller and purchaser indicates a contract for goods).

{11} North Carolina has not directly addressed the issue of whether the UCC should apply to a contract for software. Thus, this Court has looked to other jurisdictions for guidance. The case of *Advent Systems Limited v. Unisys Corp.,* 925 F. 2d 670 (3rd Cir. 1991) closely examined whether software could be considered a good or service. Advent produced an electronic document management system, a "process for transforming engineering drawings and similar documents into a computer data base." *Id.* at 672. Unisys manufactured a variety of computers. Advent and Unisys executed two documents whereby Advent agreed to provide the software and hardware making up the document systems to be sold by Unisys in the United States. *Id.* Unisys began the process of restructuring and "decided it would be better served by developing its own document system and . . . told Advent their arrangement

had ended." *Id.* Advent filed a claim in the United States District Court for the Eastern District of Pennsylvania alleging, *inter alia*, breach of contract. During pretrial proceedings, the District Court ruled that the UCC did not apply because the services aspect of the contract predominated. The jury awarded Advent $4,550,000 on the breach of contract claim. The Court of Appeals for the Third Circuit reversed and remanded the breach of contract claim after finding that the contract was subject to the UCC. *Advent,* 925 F.2d 670.

{12}    The Third Circuit analogized software to compact disc and music recordings. Its analysis is worth quoting at length here.

> Computer programs are the product of an intellectual process, but once implanted in a medium are widely distributed to computer owners. An analogy can be drawn to a compact disc recording of an orchestral rendition. The music is produced by the artistry of musicians and in itself is not a "good," but when transferred to a laser-readable disc becomes a readily merchantable commodity. Similarly, when a professor delivers a lecture, it is not a good, but, when transcribed as a book, it becomes a good.
>
> That a computer program may be copyrightable as intellectual property does not alter the fact that once in the form of a floppy disc or other medium, the program is tangible, movable and available in the marketplace. The fact that some programs may be tailored for specific purposes need not alter their status as "goods" because the Code definition includes "specially manufactured goods."
>
> * * *
>
> The relationship at issue here is a typical mixed goods and services arrangement. The services are not substantially different from those generally accompanying package sales of computer systems consisting of hardware and software.

*Id.* at 675-76.

{13}    The Court went on to point out the benefits and public policy concerns of applying the UCC to software transactions.

> Applying the U.C.C. to computer software transactions offers substantial benefits to litigants and the courts. The Code offers a uniform body of law on a wide range of questions likely to arise in computer software disputes: implied warranties, consequential damages, disclaimers of liability, the statutes of limitations, to name a few.
>
> The importance of software to the commercial world and the advantages to be gained by the uniformity inherent in the U.C.C. are strong policy arguments favoring inclusion. The contrary arguments are not persuasive, and we hold that software is a "good" within the definition of the Code.

*Id.* at 676.

{14}    When addressing whether software should fall within the category of goods, the Court finds the public policy concerns outlined in *Advent* to be compelling. However, the Court is not prepared to find that there should be a blanket rule stating that all software is a good. In addition to the factors outlined above, a Court should consider additional factors such as the degree of development and customization necessary for a particular program or customer. As this is an issue of first impression in North Carolina, the Court turns to other jurisdictions for guidance.

{15}    At one end of the spectrum is a consumer who walks into the local electronics store, pulls a

shrink-wrapped word processing program from the shelf, pays the cashier and goes home with it. Such a sale is very clearly one for a good. At the other end of the spectrum is a programmer that invents and develops new software for a particular customer. In that case, the contract is more like a services contract. *See e.g., Wharton Management Group v. Sigma Consultants, Inc.,* Del. Super. C.A. No. 89C-JA-165, 12 DLM 87 (1990) (finding that development of customized software system was not a transaction in goods) *aff'd*, 582 A.2d 936, No. 69, 1990, (Del. Sept. 19, 1990); *Pearl Invs. LLC v. Std. I/O, Inc.*, 2003 U.S. Dist. LEXIS 5376, *69-70 (D. Me. Apr. 23, 2003) ("[F]or purposes of applicability of the UCC, development of a software system from scratch primarily constitutes a service"); *Multi-Tech Sys., Inc. v. Floreat, Inc.*, 2002 U.S. Dist. LEXIS 4644, No. CIV. 01-1320 DDA/FLN (D. Minn. Mar. 18, 2002) ("The few cases considering the question indicate that the UCC does not apply to an agreement to design and develop a product, even if compensation under that agreement is based in part on later sales of that product. . . . Any software in a tangible medium . . . at best was incidental to the predominant purpose of those agreements, which was to develop and improve the . . . product.").

{16}    If that programmer were to then package the software and sell it to others, the analysis comes much closer to the sale of goods as to that transaction. Where programmers are selling preexisting software "albeit with custom modifications or upgrades to adapt it to the user's needs or equipment [and are paid] in a manner primarily reflecting sale of goods[,]" courts have been much more willing to find the contract falls under the UCC. *See Pearl* at *69-70 (citing *Micro Data Base Sys., Inc. v. Dharma Sys., Inc.*, 148 F.3d 649, 654-55 (7th Cir. 1998); *Advent*, 925 F.2d at 675-76; *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546-47 (9th Cir. 1985)).

{17}    Although Smart Online and OpenSite have referred to themselves as licensee and licensor, there is some language within the Agreement that looks like UCC language. Paragraph 8.3 refers to the warranty as a "product warranty"; Exhibit A to their Agreement allows payment by "Purchase Order." However, the Court does not rely on this language in finding that this contract falls under the UCC. The Court finds the parties treatment and assumptions about their relationship to be compelling. They have treated the contract as though it were a contract for the sale of goods. All of Smart Online's complaints have defined OpenSite as a merchant "as such term is defined in N.C.G.S. 25-2-104." Defendants have responded by answering with UCC-based defenses, citing directly to the UCC. Indeed, all parties have crafted their briefs and argued as if the Software at issue is a good that falls within the purview of the UCC.

{18}    Furthermore, this transaction was more like *Pearl* than *Wharton*. Smart Online purchased a prepackaged product. The customization involved was not sufficient to create a services contract. This software was not developed for Smart Online's use. Smart Online searched for, and purchased, pre-existing software.

{19}    The payment terms of the agreement also indicate this was a sale for goods. Smart Online purchased "SUPPORTED AND CUSTOMIZED SOFTWARE." It paid upfront for a particular program coupled with fees for additional "Galleries" for the pre-existing program. Payments for the training, support and maintenance were not the predominant factor in the contract. *See, e.g., RRX,* 772 F.2d at 546-47 ("The employee training, repair services, and system upgrading were incidental to sale of the software package and did not defeat characterization of the system as a good.") (citing *Chatlos Systems, Inc. v. National Cash Register Corp.*, 479 F. Supp. 738 (D.N.J. 1979), *aff'd*, 670 F.2d 1304

(3d Cir. 1982)).

{20}    The Court finds that the Agreement was one for the sale of goods and that the UCC applies.

{21}    Defendants argue that plaintiff's allegations regarding OpenSite's breach of the License Agreement and Maintenance and Support Agreement ("Contract") by providing Smart Online with version 1.0.3 instead of version 1.1 fail as a matter of law because plaintiff did not provide defendant reasonable notice of the alleged breach after they discovered, or reasonably should have discovered, the breach, and plaintiff waived any right to assert a breach of the license agreement when it accepted delivery of version 1.2 in June 2000. *See* N.C.G.S. §§ 25-2-607 and 2-608.

{22}    Plaintiff stated in oral argument that its allegations that the Software was nonconforming are not limited to the version number. Indeed, defendant could have called the Software anything it wanted, as long as it performed as the contract required. The version number is important only insofar as it may demonstrate that plaintiff either did or did not receive that for which it contracted. It is a question of evidence, not pleading.

{23}    The Court finds plaintiff has sufficiently pled facts that, taken in the light most favorable to the plaintiff, show Smart Online gave notice as required under the UCC. For commercial actors, notice must be commercially reasonable. N.C.G.S. § 25-2-607(3)(a). Comment 4 to this provision of the UCC further indicates that the notice need not be written, nor does it require specificity or detail. *Id.* at cmt. 4 ("The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiations.").

{24}    Under N.C.G.S. § 25-2-607, plaintiff will bear the burden of proof of proving compliance with N.C.G.S. § 25-2-607(3). The question of the reasonableness of such notice is normally a question of fact to be determined by the trier of fact. *See* N.C.G.S. § 25-1-204(2); *Maybank v. S.S. Kresge Co.,* 302 N.C. 129, 134, 273 S.E.2d 681, 684 (1981); s*ee also Superior Foods, Inc. v. Harris Teeter Super Markets, Inc.,* 288 N.C. 213, 217 S.E.2d 566 (1975); *Bryant v. Adams,* 116 N.C. App. 448, 470, 448 S.E.2d 832, 844 (1994); *Riley v. Ken Wilson Ford, Inc.,* 109 N.C. App. 163, 169, 426 S.E.2d 717, 721 (1993). The issue can become a question of law "only when the facts are undisputed and only when an inference can be drawn as to reasonableness of notice." *Maybank,* 302 N.C. at n.1 (citing *L.A. Green Seed Co. v. Williams,* 246 Ark. 463, 438 S.W. 2d 717 (1969)); *see also Whitehurst v. Crisp R.V. Center, Inc.,* 86 N.C. App. 521, 525, 358 S.E.2d 542, 545-46 (1987).

{25}    In Paragraphs 35 and 38 of the Third Amended Complaint, plaintiff properly pled that it gave notice on May 12, 2000 and June 13, 2000. Smart Online also properly pled that this notice was "less than three full months from the execution of the contract for the purchase of version 1.1 of the OpenSite Software." The Third Amended Complaint alleges that the notice given on June 13, 2000 informed OpenSite that the version they received was a "very early release of a non-tested platform," that it should have been a "fully functional . . . version without defects," and that this version was "defective" and did not "work to the promised warranty." Third Amended Complaint, ¶ 38.

{26}    If a buyer accepts a product with knowledge of its non-conformity, the buyer cannot later revoke its acceptance, unless the buyer reasonably believed the seller would cure the non-conformity. N.C.G.S. § 25-2-608(1). Revocation of acceptance "must occur within a reasonable time after the buyer discovers or should have discovered" the grounds for revocation. N.C.G.S. § 25-2-608(2). Again, the comments are illustrative. Since revocation of acceptance is generally resorted to only after

attempts at adjustment have failed, "the reasonable time period should extend in most cases beyond the time for discovery of non-conformity after acceptance and beyond the time for rejection after tender." *Id.* at cmt. 4.

{27} Whether notice of breach was "seasonable" under N.C.G.S. § 25-2-608 or "reasonable" under N.C.G.S. § 25-2-607 is a question of fact; thus, determination of these issues would not usually be appropriate for a 12(b)(6) motion.

{28} Defendants next allege that even if there was proper notice, the pleadings reveal that they cured the non-conformity by delivering version 1.2 and that plaintiff's acceptance of this version amounted to waiver. Plaintiff has countered that defendants were required to provide version 1.2 under the terms of the contract; thus, acceptance of something defendant was required to do in any event does not cure the failure to tender conforming goods. Assuming that acceptance of version 1.2 was acceptance of a cure, Paragraph 55 of the Third Complaint alleges that the cure was defective. UCC sections 2-607(2) and 2-608(1) demonstrate that acceptance of a defective cure may not prevent a buyer from revoking his acceptance. The Court finds that Smart Online has properly alleged that the cure was defective. The Court DENIES defendants' motion to dismiss the breach of contract claim for the reasons stated above.

## IV.
### BREACH OF EXPRESS WARRANTY

{29} The Court next turns to defendants' motion to dismiss Smart Online's allegation that OpenSite breached the contract by breaching an express warranty based on verbal representations that the Software would handle three to five thousand bids or transactions simultaneously. Defendants argue this claim fails because the contract that the parties signed contained a merger clause; thus, plaintiff was limited to the warranties contained in the contract. Section 8 of the License Agreement states the following:

> THIS [sic] LIMITED EXPRESS WARRANTIES SPECIFIED ABOVE ARE THE ONLY WARRANTIES MADE BY LICENSOR AND THERE ARE NO OTHER WARRANTIES OR REPRESENTATIONS OF ANY KIND, EXPRESS OR IMPLIED, BY OPERATION OF LAW OR OTHERWISE, INCLUDING WARRANTIES OR [sic] MERCHANTABILITY OF [sic] FITNESS FOR A PARTICULAR PURPOSE.

{30} In its October 15 Order, the Court ruled that this warranty was sufficient to limit the warranties of merchantability and fitness for a particular purpose.

{31} The License Agreement's merger clause is contained in section 11.14 of the Agreement:

> 11.14. Entire Agreement. This Agreement, including all of its attachments, each of which is incorporated into this Agreement, is the entire agreement between the parties with respect to its subject matter, and there are no other representations, understandings or agreements between the parties relative to such subject matter. No amendment to, or change, waiver or discharge of any provision of this Agreement shall be valid unless in writing and signed by any authorized representative of the party against which such amendment, change, waiver or discharge is sought to be enforced.

{32} Under the UCC and North Carolina case law, a warranty by description is very hard to waive. In *Muther-Ballenger v. Griffin Elec. Consultants, Inc.,* 100 N.C. App. 505, 509, 397 S.E.2d 247, 250

(1990), our Court of Appeals held that a clause generally disclaiming all warranties, express or implied, cannot reduce seller's obligation with respect to such description. The UCC states that "any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." N.C.G.S. § 2-313(1)(b). Furthermore, "whether defendant made or breached any express warranties . . . is a question of fact to be decided by the trier of fact." *Muther-Ballenger*, 100 N.C. App. at 509, 397 S.E.2d at 250.

{33}   The contract does not expressly include a representation that the Software will handle three to five thousand transactions simultaneously. However, section 1.7 defines documentation as "the written, electronic, or recorded work generally released by Licensor in connection with the Software that describes the functions and features, of the Software, including end user manuals." Such documentation describes the Software's ability to handle very large volumes, and this description may have formed the basis of the bargain. The reference to documentation describing the Software is within the contract and that documentation is thus included in the contract by reference. The effect of the merger clause is an issue that cannot be decided on the pleadings. Defendants' 12(b)(6) motion based on the merger clause is denied.

## V.

## MOTION TO DISMISS SOME DAMAGES CLAIMS

{34}   In the Court's October 15 Order, the Court granted defendants' Rule 12(b)(6) motion to limit Smart Online's contract damages to the remedies provided in the contract. The Court also gave plaintiff the opportunity to amend its complaint to address potential issues regarding its claim for special damages under tort. Smart Online amended its complaint and defendants have moved, pursuant to Rule 12(b)(6), that the Court dismiss plaintiff's tort claims for the following damages: (1) $145,000 paid to Dynamic Quest for implementation of the Software; (2) $1,935,900 paid to acquire Assets2Auction; (3) $1,817,000 paid to acquire e4close.com; (4) $3,823,000 in costs associated with expansion of Smart Online's business; and (5) additional damages based upon loss of revenue. Defendant has asked the Court to limit plaintiff's recoverable damages to $121,659, the amount plaintiff paid to license the software.

{35}   At this stage of the proceedings, the Court DENIES defendants' motion to totally limit plaintiff's recoverable damages to the amount paid to license the software. In addition to the cost of purchasing the software, Smart Online has sufficiently alleged that it may be able to recover amounts paid to Dynamic Quest and that it may be able to recover additional damages based upon lost revenue. Defendants would like to limit plaintiffs' expansion cost recovery to $240,000, which is the amount plaintiff specified in itsr June 13, 2000 notice of default. Perhaps additional discovery will reveal that plaintiff is entitled to recover some different amount than is alleged in either the June 13 letter or the complaint. However, taking the allegations in the complaint as true, plaintiff has sufficiently alleged that it could be entitled to recover at least some of its expansion costs.

{36}   Special damages are damages that are the natural but not necessary result of the alleged wrongful act of the defendant. *Oberholtzer v. Huffman,* 324 N.C. 399, 67 S.E.2d 263 (1951). As special damages, plaintiff's complaint alleges that it incurred substantial costs to acquire Assets2Auction on or about February 28, 2000 and e4close.com on or about June 26, 2000. Plaintiff relies on communications with OpenSite that occurred in March 2000, a date subsequent to the February acquisition of Assets2Auction. Plaintiff also alleges that it gave Defendant OpenSite notice of default

on May 12, 2000 and that it communicated with Defendant Siebel representatives on June 13, 2000 regarding the allegedly defective software. Paragraph 39 of plaintiff's complaint states that "[a]s of June 13, 2002, Dynamic Quest's implementation of the software had not reached the point where the software could be tested to determine whether it was actually capable of handling high volume bidding in a "multi-gallery" or "multiple action" environment." Plaintiff's decision to purchase e4close.com on June 26, 2000 in spite of the problems it was having and the lack of information it had was a business decision. Smart Online does not allege that between June 13 and the June 26 purchase of e4close.com, OpenSite made representations upon which Smart Online relied in purchasing e4close.com. Plaintiff cannot recover for costs knowingly and willingly incurred after giving defendant notice of default. The Court GRANTS defendants' motion to dismiss plaintiff's damage claims for the acquisition of e4close.com and Assets2Auction.

{37}     Plaintiff's attempt to bring the damages in under a negligent misrepresentation theory fails. "[T]he tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Raritan River Steel Co. v. Cherry, Bekaert & Holland,* 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988). Plaintiff's amended complaint does not sufficiently allege a supportable duty owed by defendants to Smart Online.

{38}     Assets2Auction was acquired before there were communications between Smart Online and OpenSite. When our appellate courts have found damages between parties without privity, they have done so in a context where the defendant owed specific duties to the public – such as accountants and civil engineers. *See, e.g., id.; Harrold v. Dowd,* 149 N.C. App. 777, 561 S.E.2d 914 (2002); *Davidson & Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 255 S.E.2d 580 (1979). The statements that Smart Online relies on for the acquisition of Assets2Auction were not made to, or for the benefit of, Smart Online. When plaintiff purchased Assets2Auction, it was not purchasing representations made by a third party.

{39}     These special damages are also unavailable in plaintiff's fraud claim. Our Supreme Court has said:

> While fraud has no all embracing definition and is better left undefined lest crafty men find a way of committing fraud which avoids the definition, the following essential elements of actionable fraud are well established: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party.

*Ragsdale v. Kennedy*, 286 N.C. 130, 138-39, 209 S.E.2d 494, 500 (1974) (citations omitted).

{40}     OpenSite could not intend to deceive an entity that it did not, should not, and could not know was relying on statements it made to Asset2Auction. The complaint clearly shows that OpenSite could not know any entity would purchase Assets2Auction based on things Assets2Auction said OpenSite told them it could do. Until Smart Online and OpenSite entered negotiations, OpenSite could not intend to deceive Smart Online. Again, the element of causation is missing. Plaintiff does not allege that it bought Assets2Auction based on OpenSite's fraud directed to Smart Online.

{41}     During oral argument, plaintiff said the realities of the market place at that time forced the parties to make commitments to purchase companies quickly and without adequate time to fully investigate oral promises. Smart Online relied on Assets2Auction's representations of what OpenSite said to

Assets2Auction, pausing only long enough to search OpenSite's website. At no point during this process did Defendant OpenSite have a duty to Plaintiff Smart Online. Assets2Auction did not even have an account with OpenSite. Furthermore, Smart Online does not allege communications between itself and OpenSite before Smart Online's acquisition of Assets2Auction. Smart Online does not allege that it purchased Assets2Auction in reliance on representations made to Smart Online by OpenSite. Plaintiff made a conscious business decision to undertake the risk that Assets2Auction would get a contract with OpenSite that provided the needed software.

{42} North Carolina does not recognize the tort of "negligent advertising." It would place an enormous burden on our economic system if the law were that a business could recover because it made a decision based on looking at someone's advertising. The Court doubts that plaintiff would want to be held to that standard in its business dealings. Under this standard, plaintiff could have purchased Assets2Auction, and if at that point plaintiff could not get a license from OpenSite because it had decided not to license to anyone, plaintiff would be able to recover. Plaintiff read advertisements, talked to a third party, and then entered a contract with full knowledge of the contract's terms. Plaintiff now wishes to walk away from that contract and rely on representations made to someone else before the contract was entered. The burden is on the business to enter into a contract that protects its interests and has the remedies it wants. Here, Smart Online failed to do so.

{43} Plaintiff has not alleged sufficient facts to demonstrate liability for the acquisition of e4close.come and Assets2Auction. The Court GRANTS defendants' motion to dismiss claims for these damages.

## VI.

## CONCLUSION

{44} For the foregoing reasons, the Court GRANTS defendants' motion to dismiss the damage claims for the acquisition of Assets2Auction and e4close.com and DENIES defendants' motions to dismiss plaintiff's claims for breach of contract and breach of express warranty. At this stage of the proceedings, the Court DENIES defendants' motions to disallow all tort-based damages incurred for the expansion of Smart Online's business and for additional damages based on loss of revenue. The Court further DENIES defendants' motion, based solely on the pleadings, to limit plaintiff's recoverable damages to the amount plaintiff paid to license the software. The issues may be more efficiently addressed at the summary judgment stage.

SO ORDERED, this the 17th day of June 2003.

---

[1] Other jurisdictions have taken a different approach. *See, e.g., Cambridge Plating Co., v. Napco, Inc.,* 991 F. 2d 21, 24 (1st Cir. 1993) ("The general trend [is] to view such mixed contracts as governed by the UCC."); *United States ex rel. Union Bldg. Materials Corp. v. Haas & Haynie Corp.,* 577 F. 2d 568, 572 n. 2 ("The modern trend is to apply Article 2 to such mixed sales/services contracts."); *Foster v. Colorado Radio Corp.,* 381 F. 2d 222, 226 (10th Cir. 1967) (applying the UCC only to the sale of goods elements of a contract).